**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

**ZENITH CAREX INTERNATIONAL**
**LIMITED**,
10 Langtang Close, Foto House
Tafawa Balewa Close, Area 3 Garki,
Abuja, Nigeria,

        Plaintiff,                CASE NO.: _____

v.

                                     **JURY TRIAL DEMANDED**

**CHEMONICS INTERNATIONAL, INC.**,
d/b/a SAII Associates Ltd/Gte.
1275 New Jersey Avenue, SE
Washington, DC 20003

        Defendant
_____/

**COMPLAINT**

Plaintiff, Zenith Carex International Limited, ("Zenith Carex" or "Plaintiff") brings this action against Chemonics International, Inc., d/b/a in Nigeria as SAII Associates Ltd/Gte (jointly "Chemonics" or Defendant") for defamation, defamation *per se*, injurious falsehood, tortious interference, breach of contract, and injunctive relief, and in support allege as follows:

**I.      NATURE OF THE ACTION**

1.      This is an action for defamation, defamation *per se*, injurious falsehood, tortious interference, breach of contract, and injunctive relief in which Plaintiff seeks remedies, including but not limited to, compensatory damages, punitive damages, injunctive relief, reasonable attorneys' fees, reimbursement for out-of-pocket costs, and court costs.

**II.      PARTIES**

2.      Plaintiff Zenith Carex is a citizen of The Federal Republic of Nigeria ("Nigeria"), being a company registered under the laws of Nigeria on November 1, 2002. Plaintiff has its head

office at 10 Langtang Close, Foto House, Tafawa Balewa Close, Area 3 Garki, Abuja, Nigeria's capital. With offices across Nigeria and in Ghana, Zenith Carex specializes in the business of courier services, logistics, and long haulage. The company employs more than 600 people and works with international aid agencies and organizations for the distribution of humanitarian aid and supplies throughout Nigeria and West Africa.

3.     Chemonics International, Inc., ("Chemonics" or "Defendant") is a citizen of the District of Columbia, being a private corporation organized and headquartered in Washington, D.C. Defendant's principal place of business is located at 1275 New Jersey Avenue SE, Washington, DC 20003. Chemonics is a global development firm that operates in over 100 countries. Chemonics works with the United States Agency for International Development (USAID) and other international development entities, such as The Global Fund to Fight AIDS, Tuberculosis, and Malaria ("The Global Fund"), to provide humanitarian aid in areas that experience challenges ranging from food security and health to climate change, education, and private sector development.

### III.    JURISIDCTION AND VENUE

4.      This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(a)(2) because this action involves a foreign citizen party, Plaintiff Zenith Carex International Limited, and Defendant Chemonics International, Inc. a private for-profit international development firm that is a citizen of Washington, D.C. The amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

5.     The Court has general personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries out business or a business

venture in the District of Columbia as a private corporation, maintains its headquarters in the District of Columbia, and committed all or part of the tortious acts in the District of Columbia.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the judicial district where Defendant Chemonics resides and the judicial district where a substantial part of the acts or omissions that gave rise to Plaintiffs' claims occurred.

## IV.    STATEMENT OF FACTS

7.     Plaintiff is a well-respected and highly regarded logistics and delivery company located in Nigeria and has been in business for 22 years.

8.     Defendant is one of the foremost purveyors of logistical services and materials through which USAID procures and distributes health commodities in Africa. Defendant provides technical assistance to improve partner countries' management of health commodities supply chains and collaborates with key international stakeholders to support global health initiatives.

9.     Defendant in its regular course of business creates subsidiary companies around the globe through which it hires employees, consultants, and sub-contractors to conduct its operations as a contractor to various international development entities including the USAID and collaboration with The Global Fund to Fight AIDS, Tuberculosis, and Malaria ("The Global Fund").

10.     The Global Fund is an independent foundation that seeks to attract and disburse financial resources in developing countries aimed at countering the three diseases that are its namesake. The Global Fund is headquartered in Geneva, Switzerland. The largest funding source worldwide for The Global Fund has historically been the U.S. Government by a large margin in comparison to other nations and funding sources. Defendant was managing the distribution of

health commodities to Nigeria on behalf of USAID to Nigeria as a partner country. In addition, Defendant handled the warehousing and distribution of commodities in Nigeria for The Global Fund.

11.    Defendant established a subsidiary company in Nigeria, SAII Associates Ltd/Gte ("SAII") through which it conducted its contractual activities for USAID and The Global Fund.

12.    SAII is wholly owned and controlled by Defendant and is the alter ego of Defendant for its work within Nigeria.

13.    On or about December 28, 2016, Defendant, through its in-country subsidiary SAII published an advertisement in Nigerian newspapers soliciting expressions of interest for the nationwide distribution of health and non-health commodities from third-party logistic companies. Plaintiff responded to the advertisement and was subsequently shortlisted for the project.

14.    Subsequently, Plaintiff was selected to provide the services and on May 23, 2017, Defendant, through its subsidiary SAII, entered into an indefinite delivery/indefinite quantity (IDIQ) subcontract with Plaintiff for the provision of long haul and last mile delivery services in accordance with the World Health Organization Good Distribution Practice (GDP) for pharmaceutical and laboratory products known as Indefinite Delivery/Indefinite Quantity Subcontract Agreement, No. 0001B-17-TLP-NGA. (See attached Exhibit 1).

15.    The subcontract required Plaintiff to provide logistics services for Defendant's contracts with USAID and The Global Fund for their joint health programs in Nigeria - the procurement and supply chain management for the USAID and The Global Fund's programs against AIDS, tuberculosis, and malaria in Nigeria.  The subcontract was for an initial term of three years and included all terms and conditions for Plaintiff's services.

16.    The subcontract was first modified on August 20, 2017, and again on May 17, 2018. A third modification was executed on May 1, 2019, signed by Christopher Scott, Defendant's Vice President.

17.    In or about January 2021, Defendant invited Plaintiff to discuss the third modification of the subcontract, including the approved price increase. Plaintiff properly justified the price increase by elaborating on the necessary logistical and security measures required for transporting expired drugs. Plaintiff emphasized the critical importance of preventing expired drugs from reentering public consumption. Defendant Chemonics accepted the explanation, and the meeting concluded with mutual understanding.

18.    The third modification dated May1, 2019, is notable as it raised the subcontract price by an additional One Billion Naira (₦1,000,000,000.00), approximately  TWO MILLION SEVEN HUNDRED EIGHTY-THREE DOLLARS (USD) ($2,783,000.00) based on May 1, 2019, US Dollar/Nigeria Naira exchange rates. This increase was attributed to uncompensated prior costs and future additional logistic costs, arising from out-of-pocket security measures required for collecting expired drugs from health care centers throughout Nigeria for confiscation and transporting the expired drugs to the sole disposal site in Port Harcourt, in the Niger Delta Region all of which costs were not covered in the original subcontract. (See attached Exhibit 2).

19.    Each subcontract modification expanded Plaintiff's duties and responsibilities in clear recognition and acknowledgement of Plaintiff's superior performance. Defendant represented that all subcontract modifications were authorized by both USAID and The Global Fund.

20.     Plaintiff demonstrated exceptional performance throughout the term of the subcontract, achieving a verifiable key performance index of 100%, which led Defendant to issue recommendation letters on behalf of Plaintiff.

21.     In a letter dated January 24, 2019, Defendant recommended Plaintiff to the United Nations World Food Program (UNWFP) as a "positive reference," highlighting Plaintiff's exemplary performance. The letter confirmed that Plaintiff had performed "superbly" under the subcontract and had consistently met the respective Key Performance Indicators as stipulated in the subcontract. (See attached Exhibit 3).

22.     Additionally, in a letter dated February 20, 2020, Defendant provided a reference for the Plaintiff to the Association for Reproductive and Family Health under the Integrated Child Health and Social Services Award (ARFH ICHSSA) in Nigeria, which was also funded by USAID. Defendant stated in that February 20, 2020, letter that Plaintiff had provided "satisfactory logistics services" to the USAID Global Health Supply Chain Programs – Procurement and Supply Management (GHSC-PSM).  The Defendant further described the Plaintiff as "a reputable firm to provide logistic services". (See attached Exhibit 4).

23.     All of Plaintiff's invoices submitted to Defendant between 2017 and 2019 were duly paid subject to a rigorous audit by four different sections of Defendant's Nigeria operation.

24.     Nonetheless, in or about March of 2020, Defendant, in conspiracy with The Global Fund, stopped honoring Plaintiff's invoices for services previously rendered. On August 27, 2020, Plaintiff reported Defendant and The Global Fund to Nigeria's Federal Ministry of Health. After the Ministry was unresponsive, Plaintiff filed a petition with the  Economic and Financial Crimes Commission ("EFCC") on February 9, 2021, claiming the outstanding ONE HUNDRED THIRTY-

SIX MILLION ONE HUNDRED TWO THOUSAND FIVE HUNDRED THIRTY-FIVE Naira (₦136,102,535.00) due and owing from Defendant.  The EFCC is charged with the responsibility of enforcing all economic and financial crimes laws in Nigeria  and is the equivalent of the Financial Crimes Enforcement Network (FinCEN) in the United States. Plaintiff supplemented the EFCC petition on February 1, 2022. Defendant then filed a counter-petition against Plaintiff at the EFCC. Eventually, Defendant capitulated, being unable to prove its specious counterclaims against Plaintiff Zenith Carex in the EFCC and offered to resolve the dispute by paying Plaintiff ONE HUNDRED TWENTY MILLION Naira (₦120,000,000.00) instead of the ONE HUNDRED THIRTY-SIX MILLION ONE HUNDRED TWO THOUSAND FIVE HUNDRED THIRTY-FIVE Naira (₦136,102,535.00) due from the outstanding unpaid invoices. Plaintiff accepted the offer. (See attached Exhibit 5).

25.    However, notwithstanding the acceptance of the offer for a reduced amount on the outstanding invoices, instead of abiding by its settlement and agreed offer to pay the agreed settlement sum of One Hundred Twenty Million Naira (₦ 120,000,000.00), Defendant initiated a sham arbitration in the United States by filing a claim for fraud and inflated invoicing against Plaintiff with the American Arbitration Association, International Center for Dispute Resolution, styled as: *Chemonics International, Inc., and SAII Associates LTD/GTE v. Zenith Carex International Limited*, Case No.: 01-21-0002-6442. (See attached Exhibit 6).

26.    Participating in a U.S. arbitration from Nigeria was costly for Plaintiff. Nonetheless, Plaintiff vigorously opposed Defendant's arbitration allegations and demanded evidence to substantiate the claims.

27.    Despite being provided an extension of time beyond the normal arbitration deadlines to provide any evidence of their claims, Defendant Chemonics ultimately could not do so and abjectly failed to provide even a scintilla of proof to justify their manufactured, false, and fraudulent claims against Plaintiff in the Arbitration.  Following the failure to provide any substantiating proof, Defendant proposed a settlement, which Plaintiff promptly accepted. The AAA panel dismissed the claims due to the settlement proposal. (See attached Exhibit 7)

28.    Plaintiff Zenith Carex and Defendant Chemonics executed a "Settlement Deed and Release" dated "March 2022."  Defendant, without admitting liability, again agreed to pay Plaintiff ₦120 Million Naira (approximately $80,000 based on current US Dollar/Nigeria Naira exchange rates) for the outstanding invoices. The settlement agreement included mutual releases from liability and an agreement not to sue regarding the "released claims."

29.    The March 2022, settlement agreement resolved the dispute between the parties with finality and no liability, malfeasance or wrongdoing by Plaintiff was found or identified and Defendant released any such claims, although none were identified or proved.

30.    Apart from the subcontract, Plaintiff had no interactions whatsoever with the USAID, The Global Funds, or the U.S. Department of Justice (USDOJ).

31.    Unbeknownst to Plaintiff, at some point in time beginning in 2020, on a date or dates to be determined by subsequent discovery, Defendant was under investigation by the USDOJ, specifically the U.S. Attorney's Office for the Western District of Missouri, for violations of the False Claims Act (FCA), 31 U.S.C. §§ 3729 - 3733, for submitting fraudulent claims for payment to the USAID.  Defendant Chemonics disclosed its fraudulent billing to the DOJ in 2020 yet never mentioned same to Plaintiff and settled any and all such claims with Plaintiff.

32.     Pursuant to the USDOJ investigation, at a time beginning in 2020, on a date or dates to be determined by subsequent discovery, and continuing Defendant maliciously and deliberately published false information to the USDOJ in an unlawful, fraudulent, and defamatory effort to absolve itself from blame and shift the blame for its fraudulent behavior to Plaintiff.

33.     Again, Defendant had two occasions to prove the knowingly false and fraudulent allegations against Plaintiff published to the USDOJ, in Nigeria before the EFCC, and in the United States in Defendant's own AAA Arbitration. Defendant never once proved any of these prior false and deceitful allegations it regurgitated to the USDOJ in a desperate attempt to exculpate itself from its own fraud and criminal behavior. In fact, not only did Defendant fail to even slightly move the needle in proof of the claims against Plaintiff, it in fact settled with Plaintiff and paid for Plaintiff's services in express recognition of the fact that Defendant knew its allegations against Plaintiff Zenith Carex of fraud and false claims for services rendered were entirely false and spuriously fabricated allegations.

34.     Astoundingly, between June 2017 and March 2020, Defendant Chemonics nonetheless knowingly falsely and maliciously represented these same knowingly false and malicious allegations to the USDOJ, despite the fact that Defendant recognized they were untrue. Defendant deceitfully and fraudulently squealing to the USDOJ in a desperate and knowingly contrived attempt to save itself by fraudulently and falsely placing the blame for its own malfeasance and criminal conduct upon Plaintiff, by stating to the USDOJ knowingly false and malicious allegations against Plaintiff, which were later repeated by the USDOJ in the December 19, 2024 Press Release, that Plaintiff:

[F]raudulently charged Chemonics for its [Zenith Carex's] long-haul delivery services based on truck tonnage as opposed to the weight per kilogram of the commodity transported, as

the subcontract between Chemonics and Zenith required. During the same time period, Zenith charged Chemonics more for last-mile delivery services than the subcontract allowed. Chemonics failed to detect Zenith's fraudulent overcharging for more than two years due to systematic process and personnel failures, including inadequate financial controls, monitoring and oversight and inadequate employee training, direction, and support. ( See attached Exhibit 10).

35.     Further, Defendant knowingly and maliciously misrepresented Plaintiff's actions in its Settlement Agreement with the USDOJ, contending the knowingly following false allegations against Plaintiff:

In January 2020, Chemonics disclosed to the United States allegations that Zenith had intentionally overbilled Chemonics for commodity distribution services and that there were allegations of possible collusion between one or more Chemonics employee and Zenith. In February 2020, in connection with an investigation by the Global Fund Office of Inspector General (GF-OIG), Chemonics updated its January 2020 disclosure and disclosed to the United States allegations that Zenith had intentionally overbilled Chemonics and LHD [Long Haul Delivery] and LMD [Last Mile Delivery] services. (See attached Exhibit 9, at Paragraph B).

36.     These representations were knowingly false when published by Defendant to the USDOJ and were maliciously made by Defendant Chemonics solely in an attempt to exculpate itself from its own fraud and false claims, in total and callous disregard for the truth.

37.     These knowingly false, fraudulent, and malicious allegations by Defendant intentionally duped and misled the USDOJ into believing that Plaintiff Zenith Carex was the guilty party in the fraud and over-billing of USAID and Global Fund, and that Defendant Chemonic's liability was vicarious only, when in fact that is patently untrue. Upon information and belief Plaintiff was never investigated by the USDOJ to confirm Defendant's spurious, intentionally false, and malicious allegations and took them at face value.

38.     Plaintiff was not aware of Defendant's actions until sometime after December 19, 2024, when the settlement of the civil fraud prosecution against Defendant became public, along with exposition of Defendant's knowingly false, fraudulent, and malicious actions.

39.     On December 19, 2024, the USDOJ Office of Public Affairs announced in a press release that Defendant Chemonics had agreed to pay $3.1 million ($3,100,000.00) to resolve allegations of fraud and violating the False Claims Act by submitting fraudulent and false claims for payment to the U.S. Agency for International Development (USAID). (See attached Exhibit 10).

40.     The December 19, 2024, USDOJ press release further stated that the settlement resolved allegations that Defendant acted recklessly in detecting fraudulent charges by its contractor, "Zenith Carex". While the release concluded that the resolution resulted from a coordinated investigation conducted by the USDOJ and USAID OIG, it is important to note that Plaintiff was never proved to have presented fraudulent charges to Defendant by any investigation known to Plaintiff. At no time was Plaintiff contacted or informed about any investigation being conducted by the U.S. government on matters Plaintiff believed to have been fully settled. (See attached Exhibit 10).

41.     Plaintiff's attention was drawn to the December 19, 2024, USDOJ press release, attached hereto as Exhibit 10, on or about January 6, 2025, by one of its clients who had encountered it online. Plaintiff was understandably surprised and shocked at the scurrilous, false, fraudulent and maliciously defamatory statements against it contained therein and knew that the only possible and logical source of these defamatory and fraudulent falsehoods was Defendant

Chemonics. Thereafter, on January 7, 2025, Plaintiff sent a letter to Defendant requesting the retraction of the damaging information, which Defendant refused to do. (See attached Exhibit 11).

42.     Plaintiff asserts that if invited to take part, it would have eagerly done so. Consequently, Plaintiff Zenith Carex contends that any investigation conducted by the U.S. government without its knowledge or participation could not have concluded that Plaintiff committed fraud or overbilled for services provided to Defendant. This is supported by the extensive investigation conducted by the EFCC, which confirmed that such activities did not occur.

43.     Furthermore, Defendant failed to present any evidence to support allegations of fraud against Plaintiff in the arbitration that Defendant initiated in Washington, D.C. against Plaintiff, despite being allowed up to 150 days to gather and present such evidence.

44.      Instead, the settlement agreement between the USDOJ and Defendant indicates that the U.S. government's investigative units relied on knowingly and demonstrably false and malicious misinformation provided by Defendant alleging that Plaintiff had engaged in invoicing fraud, instead of a thorough inquiry that would have plainly shown otherwise had it involved Plaintiff's participation.

45.     These attempted exculpatory statements by Defendant to the USDOJ and other government officials and investigators, which shall be determined and identified via further discovery in this case, as required, were knowingly false and made with malicious intent when published by Defendant in a failed attempt to exculpate themselves.

46.     The defamatory statements made to the USDOJ by Defendant became more devastating to Plaintiff's reputation when, following the USDOJ press release, an official of Defendant communicated with Devex, a global media platform for the humanitarian aid

development community, including development organizations, donor agencies, suppliers and aid workers that serves to connect with and inform development, health, humanitarian, and sustainability professionals through news, business intelligence, funding and career opportunities related to international development. In an online article dated December 23, 2024, Defendant's official disclosed to Devex that the settlement "now brings finality to this matter, and we continue to deny liability as the subcontractor [Plaintiff] defrauded Chemonics and the U.S. government despite the controls and oversight both have in place." *https://www.devex.com/news/devex-newswire-usaid-faces-new-inquiries-on-controversial-9-5b-project-108982*. This statement was knowingly false when made and was made with malicious intent when published by Defendant's official to Devex. (See attached Exhibit 12).

47.    Defendant's misrepresentation to the DOJ and subsequent settlement and, in particular, Defendant's official's statement to Devex have significantly damaged Plaintiff's reputation as a reputable and upright corporate entity in Nigeria. This damage extends to the perception of all businesses and international organizations with which Plaintiff has collaborated, serviced contracts, or is currently being considered for future contracts.

48.    Defendant's official statement to the Devex publication has gained significant attention, being accessed by subscribers, business professionals, and the general public through social media and physical copies, both within the United States and internationally.

49.    On February 4, 2025, People Gazette, an online news and current events publication based in Nigeria, published the false allegation on its website that "DOJ fines USAID affiliate $3.1 million over fraud committed by Nigerian HIV/AIDS contractor Zenith Carex," and that

"Chemonics which did not immediately suspect foul play passed all the fraudulent bill to USAID for payment." (See attached Exhibit 13).

50.     The People Gazette publication was read by Plaintiff's client who sent a WhatsApp message to Plaintiff's managing director, which read "Hello Lekan, I hope you're ok, please, what's going on?" (See attached Exhibit 14).

51.     Also on February 4, 2025, another online publication, Rifnote Media, amplified and published the same false allegation on its website that "Justice department fines USAID affiliate $3.1m over fraud by Nigerian HIV/AIDS contractor." The publication went on to state that "Chemonics International Inc., agreed to pay a fine of $3.1 million to the U.S. government over the fraudulent activities of its Nigerian subcontractor Zenith Carex for inflating its bills, massively overcharging U.S. Agency for International Development (USAID) for distributing sensitive HIV/AIDS packages." (See attached Exhibit 15).

52.     Rifnote Media curates top headline stories about current events from Nigeria and across the world and publishes them to a large global audience.

53.     The widespread distribution and consumption of the knowingly false, fraudulent, and malicious allegations of fraud against Plaintiff initiated by Defendant Chemonics are each actionable acts of defamation as direct, natural, probable, and foreseeable outcome of the statement.

54.     Defendants' statements to the USDOJ, and subsequently to the various media outlets and platforms in an attempt to deflect the blame for their wrongdoing were made with actual malice and wrongful and willful intent to injure Plaintiff. Further, the statements were made

with reckless disregard for the truth or falsity or with knowledge of their falsity and with wanton and willful disregard for the reputation and rights of Plaintiff.

55.     Following the defamatory publications of Defendant, several of Plaintiff's clients have withdrawn their existing contracts with Plaintiff or have expressed the intention to cease dealing with Plaintiff, thereby terminating dismissed any pending or prospective business with Plaintiff as a direct and proximate result of Defendant defamatory, malicious, and fraudulent misrepresentations. These actions have caused grave damage to Plaintiff Zenith Carex, leading to a near-total collapse of the Plaintiff's enterprise.

56.     By way of example and not limitation, Plaintiff's $4.5 billion Naira ($3.2 million USD) contract with an international aid organization has been suspended due to the actions of Defendant, as have a number of lucrative logistics contracts in Nigeria, all to the severe and ongoing financial and reputational harm of Plaintiff.

57.     All conditions precedent to this action have been performed, have occurred, or have been waived.

## COUNT I – DEFAMATION
## STATEMENTS TO THE USDOJ

58.     Plaintiff repeats and realleges Paragraphs 1 through 57, above, as if fully set forth herein.

59.     In or about the time period beginning in 2020, and leading up to the December 19, 2024, announced settlement of the civil fraud charges against it brought by the U.S. Attorney's Office for the Western District of Missouri, Defendant intentionally published to Trial Attorneys Robin Overby and Samuel Lehman of the Justice Department's Civil Division and Assistant U.S. Attorneys Matt Sparks and Cari Walsh for the Western District of Missouri, and others unknown

at this time, false statements, misrepresentations and unfounded allegations of criminal behavior by Plaintiff in an effort to exculpate itself of the pending civil fraud charges.

60.    The publication by Defendant of its statements against Plaintiff to the U.S. Attorney's Office for the Western District of Missouri, whether in an attempt to deflect blame or exculpate itself or otherwise, were known by Defendant Chemonics to be false when made.

61.    Defendant knew or should have known that the statements asserting that Plaintiff committed fraud, and other criminal acts were false.

62.    Defendant published or shared these false statements with a third-party or parties, the USDOJ.

63.    The knowingly false statements against Plaintiff by Defendant were not privileged or excused.

64.    Plaintiff Zenith Carex did not discover Defendant's actions until December 19, 2024,

65.    Defendant's false and malicious statements and publications caused Plaintiff to suffer public criticism that has brought shame, public humiliation, and disgrace upon Plaintiff and has substantially lowered the esteem of Plaintiff in the eyes of the community it serves and in general.

66.    Defendant's defamatory publications proximately caused harm to Plaintiff's reputation or finances in the form of actual damages in amount not less than TEN MILLION DOLLARS (USD) ($10,000,000.00), or such amount as will be proved at trial.

67.    Defendant published or caused to be published, and have continued to promote, the knowingly false narrative and the speciously and maliciously false statements set forth

hereinabove that Plaintiff was the cause of, and responsible for, the prosecution of Defendant by the U.S. Attorney's Office for the Western District of Missouri and the finding of fraud and False Claims Act violations against Defendant or a significantly contributing cause of its legal troubles and resultant potential public condemnation.

68.     Defendant presented a vile and knowingly false narrative that it was Plaintiff's fault, all of which knowingly false and malicious misrepresentations were uttered or published with the specific intent to cause harm to Plaintiff and set it up as the unwitting scapegoat or dupe who was conveniently unable to defend itself, in order for Defendant to escape liability and dodge public censure for its illegal behavior.

69.     Defendant's actions were fraudulently and maliciously calculated to blame Plaintiff and thereby preserve Defendant's financial prospects and reputation, while purposefully damaging the financial prospects and reputation of Plaintiff through knowing and malicious falsehoods designed to intentionally and maliciously harm Plaintiff without regard for the truth or the impact of its deliberate and malicious actions.

70.     Defendant has thereby purposefully and in a calculated manner exhibited willful misconduct, malice, recklessness, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages to Plaintiff in this cause.

## COUNT II – DEFAMATION *PER SE*
## STATEMENTS TO THE USDOJ

71.     Plaintiff repeats and realleges Paragraphs 1 through 57, above, as if fully set forth herein.

72.     In or about the time period beginning in 2020, and leading up to the December 19, 2024, announced settlement of the civil fraud charges against it brought by the U.S. Attorney's Office for the Western District of Missouri, Defendant intentionally published to Trial Attorneys Robin Overby and Samuel Lehman of the Justice Department's Civil Division and Assistant U.S. Attorneys Matt Sparks and Cari Walsh for the Western District of Missouri, and others unknown at this time, false statements, misrepresentations and unfounded allegations of criminal behavior by Plaintiff in an effort to exculpate itself of the pending civil fraud charges.

73.     The publication by Defendant of its statements against Plaintiff to the U.S. Attorney's Office for the Western District of Missouri, whether in an attempt to deflect blame or exculpate itself or otherwise, were known by Defendant Chemonics to be false when made.

74.     Defendant knew or should have known that the statements asserting that Plaintiff committed fraud, and other criminal acts were false.

75.     Defendant's publications to the United States Attorney's Office were defamatory *per se* because they stated or implied that Plaintiff was guilty of a crime of moral turpitude.

76.     Defendant published or shared these false statements with a third-party or parties, the USDOJ.

77.     The knowingly false statements against Plaintiff by Defendant were not privileged or excused.

78.     Plaintiff did not discover Defendant's actions until December 19, 2024.

79.    Defendant's false and malicious statements and publications caused Plaintiff to suffer public criticism that has brought shame, public humiliation, and disgrace upon Plaintiff and has substantially lowered the esteem of Plaintiff in the eyes of the community it serves and in general.

80.    Defendant's defamatory *per se* publications proximately caused harm to Plaintiff's reputation or finances and business opportunities in the form of actual damages in an amount not less than TEN MILLION DOLLARS (USD) ($10,000,000.00), or such amount as will be proved at trial.

81.    Defendant published or caused to be published, and have continued to promote, the knowingly false narrative and the speciously and maliciously false statements set forth hereinabove that Plaintiff was the cause of, and responsible for, the prosecution of Defendant by the U.S. Attorney's Office for the Western District of Missouri and the finding of fraud and False Claims Act violations against Chemonics or a significantly contributing cause of its legal troubles and resultant potential public condemnation.

82.    Defendant presented a vile and knowingly false narrative that it was Plaintiff's fault, all of which knowingly false and malicious misrepresentations were uttered or published with the specific intent to cause harm to Plaintiff and set it up as the unwitting scapegoat or dupe who was conveniently unable to defend itself, in order for Defendant to escape liability and dodge public censure for its illegal behavior.

83.    Defendant's actions were fraudulently and maliciously calculated to blame Plaintiff and thereby preserve Defendant's financial prospects and its reputation, while purposefully damaging the financial prospects and reputation of Plaintiff through knowing and malicious

falsehoods designed to intentionally and maliciously harm Plaintiff without regard for the truth or the financial and reputational devastating impact of their deliberate and malicious actions.

84.    Defendant has thereby purposefully and in a calculated manner exhibited willful misconduct, malice, recklessness, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages to Plaintiff in this cause.

**COUNT III – DEFAMATION**
**<u>STATEMENTS TO DEVEX</u>**

85.    Plaintiff repeats and realleges Paragraphs 1 through 57, above, as if fully set forth herein.

86.    At some time period after the December 19, 2024, USDOJ press release, Defendant intentionally published to Devex, its writer(s) or staff, knowingly false statements, misrepresentations and unfounded allegations of criminal behavior by Plaintiff in a calculated and deliberate  effort to spread falsehoods in an intentional media campaign to excuse or exculpate itself for its admitted unlawful behavior as regards the settled civil fraud charges, which were published by Defendant in the article published by Devex on December 23, 2024, that went viral thereafter.

87.    The publication by Defendant of its statements against Plaintiff to Devex, its writer(s), contributors, or staff whether in an attempt to deflect blame, exculpate itself or bolster or repair its reputation or otherwise, were known by Defendant Chemonics to be false when made.

88.    Defendant knew or should have known that the statements asserting that Plaintiff committed fraud and other criminal acts to Devex, its writer(s), contributors, or staff were false.

89.     Defendant published or shared these false statements with a third-party or parties, Devex and its writer(s) or staff.

90.     The knowingly false statements against Plaintiff by Defendant to Devex and its writer(s), contributors, or staff were not privileged or excused.

91.     Defendant's false and malicious statements and publications caused Plaintiff to suffer public criticism that has brought shame, public humiliation, and disgrace upon Plaintiff and has substantially lowered the esteem of Plaintiff in the eyes of the community it serves and in general.

92.     Defendant's defamatory publications to Devex and its writer(s), contributors, or staff have gone viral and have proximately caused harm to Plaintiff's reputation or finances in the form of actual damages in an amount not less than TEN MILLION DOLLARS (USD) ($10,000,000.00), or such amount as will be proved at trial.

93.     Defendant published or caused to be published, and have continued to promote, the knowingly false narrative and the speciously and maliciously false statements set forth hereinabove that Plaintiff was the cause of, and responsible for, the prosecution of Defendant by the U.S. Attorney's Office for the Western District of Missouri and the finding of fraud and False Claims Act violations against Defendant or a significantly contributing cause of its legal troubles and resultant potential public condemnation.

94.     Defendant presented and perpetuated a vile and knowingly false narrative through its media campaign to save its reputation and standing as one of USAID's largest beneficiaries that it's illegal actions and subsequent settlement with the United States government was actually Plaintiff's fault, all of which knowingly false and malicious misrepresentations were uttered or

published with the specific intent to cause harm to Plaintiff and set it up as the unwitting scapegoat or dupe who was conveniently unable to defend itself, in order for Defendant to escape liability and dodge public censure for its illegal behavior.

95.     Defendant's actions were fraudulently and maliciously calculated to blame and thereby preserve Defendant's financial prospects and reputation, while purposefully damaging the financial prospects and reputation of Plaintiff through a media campaign and otherwise through knowing and malicious falsehoods designed to intentionally and maliciously harm Plaintiff without regard for the truth or the impact of Defendant's deliberate and malicious actions.

96.     Defendant has thereby purposefully and in a calculated manner exhibited willful misconduct, malice, recklessness, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages to Plaintiff in this cause.

### COUNT IV – DEFAMATION *PER SE*
### STATEMENTS TO DEVEX

97.     Plaintiff repeats and realleges Paragraphs 1 through 57, above, as if fully set forth herein.

98.     At some time period after the December 19, 2024, USDOJ press release, Defendant intentionally published to Devex, its writer(s) or staff, knowingly false statements, misrepresentations and unfounded allegations of criminal behavior by Plaintiff in a calculated and deliberate  effort to spread falsehoods in an intentional media campaign to excuse or exculpate itself for its admitted unlawful behavior as regards the settled civil fraud charges, which were published by Defendant in the article published by Devex on December 23, 2024, that went viral thereafter.

99.     The publication by Defendant of its statements against Plaintiff to Devex, its writer(s), contributors, or staff whether in an attempt to deflect blame, exculpate itself or bolster or repair its reputation or otherwise, were known by Defendant to be false.

100.    Defendant knew or should have known that the statements asserting that Plaintiff committed fraud and other criminal acts to Devex, its writer(s), contributors, or staff were false.

101.    Defendant Chemonics published or shared these false statements with a third-party or parties, Devex and its writer(s) or staff.

102.    The knowingly false statements against Plaintiff by Defendant to Devex and its writer(s), contributors, or staff were not privileged or excused.

103.    Defendant's publications to Devex, its writer(s), contributors, or staff were defamatory *per se* because they stated or implied that Plaintiff was guilty of a crime of moral turpitude.

104.    Defendant's false and malicious statements and publications caused Plaintiff to suffer public criticism that has brought shame, public humiliation, and disgrace upon Plaintiff and has substantially lowered the esteem of Plaintiff in the eyes of the community they serve and in general.

105.    Defendant's defamatory *per se* publications to, Devex and its writer(s), contributors, or staff have gone viral and have proximately caused harm to Plaintiff's reputation or finances in the form of actual damages in an amount not less than TEN MILLION DOLLARS (USD) ($10,000,000.00), or such amount as will be proved at trial.

106.    Defendant published or caused to be published, and have continued to promote, the knowingly false narrative and the speciously and maliciously false statements set forth

hereinabove that Plaintiff was the cause of, and responsible for, the prosecution of Defendant by the U.S. Attorney's Office for the Western District of Missouri and the finding of fraud and False Claims Act violations against Defendant or a significantly contributing cause of its legal troubles and resultant potential public condemnation.

107.    Defendant presented and perpetuated a vile and knowingly false narrative through its media campaign to save its reputation and standing as one of USAID's largest beneficiaries that it's illegal actions and subsequent settlement with the United States government was actually Plaintiff's fault, all of which knowingly false and malicious misrepresentations were uttered or published with the specific intent to cause harm to Plaintiff and set it up as the unwitting scapegoat or dupe who was conveniently unable to defend itself, in order for Defendant to escape liability and dodge public censure for its illegal behavior.

108.    Defendant' actions were fraudulently and maliciously calculated to blame Plaintiff and thereby preserve Defendant's financial prospects and reputation, while purposefully damaging the financial prospects and reputation of Plaintiff through a media campaign and otherwise through knowing and malicious falsehoods designed to intentionally and maliciously harm Plaintiff without regard for the truth or the impact of Defendant's deliberate and malicious actions.

109.    Defendant has thereby purposefully and in a calculated manner exhibited willful misconduct, malice, recklessness, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages to Plaintiff in this cause.

## COUNT V – DEFAMATION
## STATEMENTS TO RIFNOTE MEDIA

110.    Plaintiff Zenith Carex repeats and realleges Paragraphs 1 through 57, above, as if fully set forth herein.

111.    At some time period after the December 19, 2024, USDOJ press release, Defendant intentionally published to Rifnote Media, its writer(s) or staff, knowingly false statements, misrepresentations and unfounded allegations of criminal behavior by Plaintiff in a calculated and deliberate effort to spread falsehoods in an intentional media campaign to excuse or exculpate themselves for their admitted unlawful behavior as regards the settled civil fraud charges, which were published by Defendant in the article published by Rifnote Media on February 4, 2025, that went viral in Nigeria and worldwide thereafter.

112.    The publication by Defendant of its statements against Plaintiff to Rifnote Media, its writer(s), contributors, or staff whether in an attempt to deflect blame, exculpate itself or bolster or repair its reputation or otherwise, were known by Defendant Chemonics to be false when made.

113.    Defendant knew or should have known that the statements asserting that Plaintiff committed fraud and other criminal acts to Rifnote Media, its writer(s), contributors, or staff were false.

114.    Defendant published or shared these false statements with a third-party or parties, Rifnote Media, and its writer(s) or staff.

115.    The knowingly false statements against Plaintiff by Defendant to Rifnote Media and its writer(s), contributors, or staff were not privileged or excused.

116.    Defendant's false and malicious statements and publications caused Plaintiff to suffer public criticism that has brought shame, public humiliation, and disgrace upon Plaintiff and

has substantially lowered the esteem of Plaintiff in the eyes of the community they serve and in general.

117.    Defendant's defamatory publications to Rifnote Media and its writer(s), contributors, or staff have gone viral and have proximately caused harm to Plaintiff's reputation or finances in the form of actual damages in an amount not less than TEN MILLION DOLLARS (USD) ($10,000,000.00), or such amount as will be proved at trial.

118.    Defendant published or caused to be published, and have continued to promote, the knowingly false narrative and the speciously and maliciously false statements set forth hereinabove that Plaintiff was the cause of, and responsible for, the prosecution of Defendant by the U.S. Attorney's Office for the Western District of Missouri and the finding of fraud and False Claims Act violations against Defendant or a significantly contributing cause of its legal troubles and resultant potential public condemnation.

119.    Defendant presented and perpetuated a vile and knowingly false narrative through its media campaign to save their reputation and standing as one of USAID's largest beneficiaries that it's illegal actions and subsequent settlement with the United States government was actually Plaintiff's fault, all of which knowingly false and malicious misrepresentations were uttered or published with the specific intent to cause harm to Plaintiff and set it up as the unwitting scapegoat or dupe who was conveniently unable to defend itself, in order for Defendant to escape liability and dodge public censure for its illegal behavior.

120.    Defendant's actions were fraudulently and maliciously calculated to blame Plaintiff and thereby preserve Defendant's future financial prospects and its reputation, while purposefully damaging the financial prospects and reputation of Plaintiff through a media campaign and

otherwise through knowing and malicious falsehoods designed to intentionally and maliciously harm Plaintiff without regard for the truth or the impact of Defendant's deliberate and malicious actions.

121.    Defendant has thereby purposefully and in a calculated manner exhibited willful misconduct, malice, recklessness, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages to Plaintiff Zenith in this cause.

**COUNT VI – DEFAMATION *PER SE*
STATEMENTS TO RIFNOTE MEDIA**

122.    Plaintiff repeats and realleges Paragraphs 1 through 57, above, as if fully set forth herein.

123.    At some time period after the December 19, 2024, USDOJ press release, Defendant intentionally published to Rifnote Media, its writer(s) or staff, knowingly false statements, misrepresentations and unfounded allegations of criminal behavior by Plaintiff Zenith Carex in a calculated and deliberate effort to spread malicious falsehoods in an intentional media campaign to excuse or exculpate itself for its admitted unlawful behavior as regards the settled civil fraud charges, which were published by Defendant in the article published by Rifnote Media on February 4, 2025, that went viral in Nigeria and worldwide thereafter.

124.    The publication by Defendant of its statements against Plaintiff to Rifnote Media, its writer(s), contributors, or staff whether in an attempt to deflect blame, exculpate itself or bolster or repair its reputation or otherwise, were known by Defendant Chemonics to be false when made.

125. Defendant knew or should have known that the statements asserting that Plaintiff committed fraud and other criminal acts to Rifnote Media, its writer(s), contributors, or staff were false.

126. Defendant published or shared these false statements with a third party or parties, Rifnote Media and its writer(s) or staff.

127. The knowingly false statements against Plaintiff by Defendant to Rifnote Media and its writer(s), contributors, or staff were not privileged or excused.

128. Defendant's publications to Rifnote Media, its writer(s), contributors, or staff were defamatory *per se* because they stated or implied that Plaintiff was guilty of a crime of moral turpitude.

129. Defendant's false and malicious statements and publications caused Plaintiff to suffer public criticism that has brought shame, public humiliation, and disgrace upon Plaintiff and has substantially lowered the esteem of Plaintiff in the eyes of the community it serves and in general.

130. Defendant's defamatory *per se* publications to Rifnote Media, and its writer(s), contributors, or staff have gone viral and have proximately caused harm to Plaintiff's reputation or finances in the form of actual damages in an amount not less than TEN MILLION DOLLARS (USD) ($10,000,000.00), or such amount as will be proved at trial.

131. Defendant published or caused to be published, and have continued to promote, the knowingly false narrative and the speciously and maliciously false statements set forth hereinabove that Plaintiff was the cause of, and responsible for, the prosecution of Defendant by the U.S. Attorney's Office for the Western District of Missouri and the finding of fraud and False

Claims Act violations against Defendant or a significantly contributing cause of its legal troubles and resultant potential public condemnation.

132.    Defendant presented and perpetuated a vile and knowingly false narrative through its media campaign to save its reputation and standing as one of USAID's largest beneficiaries that its illegal actions and subsequent settlement with the United States government was actually Plaintiff's fault, all of which knowingly false and malicious misrepresentations were uttered or published with the specific intent to cause harm to Plaintiff and set it up as the unwitting scapegoat or dupe who was conveniently unable to defend itself, in order for Defendant to escape liability and dodge public censure for its illegal behavior.

133.    Defendant's actions were fraudulently and maliciously calculated to blame Plaintiff, and thereby preserve Defendant's financial prospects and its reputation, while purposefully damaging the financial prospects and reputation of Plaintiff through a media campaign and otherwise through knowing and malicious falsehoods designed to intentionally and maliciously harm Plaintiff Zenith Carex without regard for the truth or the impact of Defendant's deliberate and malicious actions.

134.    Defendant has thereby purposefully and in a calculated manner exhibited willful misconduct, malice, recklessness, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages to Plaintiff in this cause.

### COUNT VII – DEFAMATION
### STATEMENTS TO PEOPLES GAZETTE

135.    Plaintiff repeats and realleges Paragraphs 1 through 57, above, as if fully set forth herein.

136.    At some time period after the December 19, 2024, USDOJ press release, Defendant intentionally published to Peoples Gazette, its writer(s), contributors, or staff, knowingly false statements, misrepresentations and unfounded allegations of criminal behavior by Plaintiff in a calculated and deliberate effort to spread falsehoods in an intentional media campaign to excuse or exculpate itself for its admitted unlawful behavior as regards the settled civil fraud charges, which were published by Defendant in the article published by People Gazette on February 4, 2025, that went viral in Nigeria and worldwide thereafter.

137.    The publication by Defendant of its statements against Plaintiff to Peoples Gazette, its writer(s), contributors, or staff whether in an attempt to deflect blame, exculpate itself or bolster or repair its reputation or otherwise, were known by Defendant to be false.

138.    Defendant knew or should have known that the statements asserting that Plaintiff committed fraud and other criminal acts to Peoples Gazette, its writer(s), contributors, or staff were false.

139.    Defendant published or shared these false statements with a third-party or parties, Peoples Gazette and its writer(s) or staff.

140.    The knowingly false statements against Plaintiff by Defendant to Peoples Gazette and its writer(s), contributors, or staff were not privileged or excused.

141.    Defendant's false and malicious statements and publications caused Plaintiff to suffer public criticism that has brought shame, public humiliation, and disgrace upon Plaintiff and has substantially lowered the esteem of Plaintiff in the eyes of the community it serves and in general.

142.    Defendant's defamatory publications to Peoples Gazette and its writer(s), contributors, or staff have gone viral and have proximately caused harm to Plaintiff's reputation or finances in the form of actual damages in an amount not less than TEN MILLION DOLLARS (USD) ($10,000,000.00), or such amount as will be proved at trial.

143.    Defendant published or caused to be published, and have continued to promote, the knowingly false narrative and the speciously and maliciously false statements set forth hereinabove that Plaintiff  was the cause of, and responsible for, the prosecution of Defendant by the U.S. Attorney's Office for the Western District of Missouri and the finding of fraud and False Claims Act violations Act violations against Defendant or a significantly contributing cause of its legal troubles and resultant potential public condemnation.

144.    Defendant presented and perpetuated a vile and knowingly false narrative through its media campaign to save its reputation and standing as one of USAID's largest beneficiaries that its illegal actions and subsequent settlement with the United States government was actually Plaintiff's fault, all of which knowingly false and malicious misrepresentations were uttered or published with the specific intent to cause harm to Plaintiff and set it up as the unwitting scapegoat or dupe who was conveniently unable to defend itself, in order for Defendant to escape liability and dodge public censure for its illegal behavior.

145.    Defendant's actions were fraudulently and maliciously calculated to blame Plaintiff and thereby preserve Defendant's future financial prospects and reputation, while purposefully damaging the financial prospects and reputation of Plaintiff through a media campaign and otherwise through knowing and malicious falsehoods designed to intentionally and maliciously

harm Plaintiff without regard for the truth or the impact of Defendant's deliberate and malicious actions.

146.    Defendant has thereby purposefully and in a calculated manner exhibited willful misconduct, malice, recklessness, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages to Plaintiff Zenith in this cause.

**COUNT VIII – DEFAMATION *PER SE*
STATEMENTS TO PEOPLES GAZETTE**

147.    Plaintiff repeats and realleges Paragraphs 1 through 57, above, as if fully set forth herein.

148.    At some time period after the December 19, 2024, USDOJ press release, Defendant Defendant intentionally published to Peoples Gazette, its writer(s) or staff, knowingly false statements, misrepresentations and unfounded allegations of criminal behavior by Plaintiff in a calculated and deliberate effort to spread falsehoods in an intentional media campaign to excuse or exculpate itself for its admitted unlawful behavior as regards the settled civil fraud charges, which were published by Defendant in the article published by People Gazette on February 4, 2025, that went viral in Nigeria and worldwide thereafter.

149.    The publication by Defendant of its statements against Plaintiff to People's Gazette, its writer(s), contributors, or staff whether in an attempt to deflect blame, exculpate itself or bolster or repair its reputation or otherwise, were known by Defendant Chemonics to be false when made.

150.    Defendant knew or should have known that the statements asserting that Plaintiff committed fraud and other criminal acts to Peoples Gazette, its writer(s), contributors, or staff were false.

**Page 32 of 41**

151.    Defendant published or shared these false statements with a third-party or parties, Peoples Gazette and its writer(s) or staff.

152.    The knowingly false statements against Plaintiff by Defendant to Peoples Gazette and its writer(s), contributors, or staff were not privileged or excused.

153.    Defendant's publications to Peoples Gazette, its writer(s), contributors, or staff were defamatory *per se* because they stated or implied that Plaintiff was guilty of a crime of moral turpitude.

154.    Defendant's false and malicious statements and publications caused Plaintiff to suffer public criticism that has brought shame, public humiliation, and disgrace upon Plaintiff and has substantially lowered the esteem of Plaintiff in the eyes of the community it serves and in general.

155.    Defendant's defamatory *per se* publications to Peoples Gazette, and its writer(s), contributors, or staff have gone viral and have proximately caused harm to Plaintiff's reputation or finances in the form of actual damages in an amount not less than TEN MILLION DOLLARS (USD) ($10,000,000.00), or such amount as will be proved at trial.

156.    Defendant published or caused to be published, and have continued to promote, the knowingly false narrative and the speciously and maliciously false statements set forth hereinabove that Plaintiff was the cause of, and responsible for, the prosecution of Defendant by the U.S. Attorney's Office for the Western District of Missouri and the finding of fraud and False Claims Act violations against Defendant or a significantly contributing cause of its legal troubles and resultant potential public condemnation.

157.     Defendant presented and perpetuated a vile and knowingly false narrative through its media campaign to save its reputation and standing as one of USAID's largest beneficiaries that its illegal actions and subsequent settlement with the United States government was actually Plaintiff's fault, all of which knowingly false and malicious misrepresentations were uttered or published with the specific intent to cause harm to Plaintiff and set it up as the unwitting scapegoat or dupe who was conveniently unable to defend itself, in order for Defendant to escape liability and dodge public censure for its illegal behavior.

158.     Defendant's actions were fraudulently and maliciously calculated to blame Plaintiff, and thereby preserve Defendant's financial prospects and reputation, while purposefully damaging the financial prospects and reputation of Plaintiff through a media campaign and otherwise through knowing and malicious falsehoods designed to intentionally and maliciously harm Plaintiff without regard for the truth or the impact of Defendant's deliberate and malicious actions.

159.     Defendant has thereby purposefully and in a calculated manner exhibited willful misconduct, malice, recklessness, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages to Plaintiff in this cause.

**COUNT IX – INJURIOUS FALSEHOOD**

160.     Plaintiff repeats and realleges Paragraphs 1 through 159, above, as if fully set forth herein.

161.     Defendant Chemonics has published unprivileged false statements concerning Plaintiff Zenith Carex's services and property.

162.    Defendant Chemonics acted with malice and reckless disregard for the truth in making the statements.

163.    The statements were intended to and did cause financial harm to Plaintiff Zenith Carex.

164.    As a direct and proximate result of Defendant's false statements, Plaintiff has suffered pecuniary damage, loss of business opportunities, and other financial losses for which compensatory damages are due in an amount not less than TEN MILLION DOLLARS ($10,000,000.00) or such amount to be determined at trial.

165.    Defendant's false statements were calculated to fraudulently and maliciously fix blame on Plaintiff rather than itself and thereby preserve Defendant's future financial prospects and reputation, while purposefully damaging Plaintiff's property and services through a media campaign and otherwise through knowing and malicious falsehoods designed to intentionally and maliciously harm Plaintiff without regard for the truth or the impact of Defendant's deliberate and malicious actions.

166.    Defendant has thereby purposefully and in a calculated manner exhibited willful misconduct, malice, recklessness, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages to Plaintiff in this cause.

## <u>COUNT X – TORTIOUS INTERFERENCE</u>

167.    Plaintiff repeats and realleges Paragraphs 1 through 166, above, as if fully set forth herein.

168. Plaintiff has numerous and *bona fide* advantageous and expected business relationships to provide logistical delivery and pick-up services to various local and international humanitarian aid and other clients, including by way of example and not limitation, USAID, and several Nigerian businesses.

169. These business relationships between Plaintiff and these entities are reasonably expected to result in binding agreements for provision of Plaintiff's services, manpower, materials, and expertise.

170. Defendant had knowledge of Plaintiff's business and of the business relationships or expectancy of future business in the logistics sector and otherwise as of not later than May 23, 2017, and continuing to the present day.

171. In fact, Defendant knew or should have known that the exemplary performance of Plaintiff in completion of the Subcontract, as amended, would result in the fruits of Plaintiffs work being borne in additional contracts, which performance resulted in accolades, recommendations and commendations from Defendant before they undertook the tortious and breaching acts set forth herein to absolve themselves.

172. Defendant has intentionally, unlawfully, and maliciously interfered with the advantageous and expected business relationships between Plaintiff and its existing and anticipated clients by taking the actions described herein.

173. Defendant intentional interference has induced or caused a breach or termination of Plaintiff's contractual relationships or expectancies of contracts.

174. But for Defendant's interference in Plaintiff's business relationships, Plaintiff would have entered into binding agreements.

175.    The loss of such agreements has damaged and will continue to damage Plaintiff.

176.    These damages include loss of goodwill, loss of income, loss of future earnings and profits and other compensatory damages in an amount not less than TEN MILLION DOLLARS ($10,000,000.00), or such amount to be determined at trial.

177.    Defendant Chemonics' actions were deliberately calculated to harm Plaintiff Zenith Carex and destroy Plaintiff's business relationships and future business relationships through knowing and malicious falsehoods designed to intentionally and maliciously harm Plaintiff without regard for the truth or the impact of Defendant's deliberate and malicious actions.

178.    Defendant Chemonics has thereby purposefully and in a calculated manner exhibited willful misconduct, malice, recklessness, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages to Plaintiff Zenith Carex in this cause.

## COUNT XI – BREACH OF CONTRACT

179.    Plaintiff Zenith Carex repeats and realleges Paragraphs 1 through 177, above, as if fully set forth herein.

180.    On or about May 23, 2017, Defendant, through its subsidiary SAII, entered into an indefinite delivery/indefinite quantity (IDIQ) subcontract ("Subcontract") with Plaintiff for the provision of long haul and last mile delivery services in accordance with the World Health Organization Good Distribution Practice (GDP) for pharmaceutical and laboratory products known as Indefinite Delivery/Indefinite Quantity Subcontract Agreement, No. 0001B-17-TLP-NGA. (See attached Exhibit 1).

181.    The Subcontract, as amended, contains a meeting of the minds, and agreed consideration for Plaintiff's services and is a valid and enforceable contract.

182.    Every contract contains an implied covenant of good faith and fair dealing, the breach of which is actionable as a breach of contract.

183.    Defendant's actions have the effect of destroying or injuring the right of Plaintiff to receive the fruits of the Subcontract, as amended.

184.    Defendant Chemonics has acted in bad faith or has acted arbitrarily and capriciously to intentionally and willfully harm Plaintiff Zenith Carex

185.    Defendant has breached its duty of good faith and fair dealing and the implied covenant of good faith and fair dealing in the Subcontract, as amended.

186.    Defendant has materially breached the Subcontract, as amended, through its actions set forth herein.

187.    Plaintiff has been damaged as a direct and proximate result of Defendant willful breach of the Subcontract, as amended which has proximately caused harm to Plaintiff's reputation or finances in the form of actual damages in an amount not less than TEN MILLION DOLLARS (USD) ($10,000,000.00), or such amount as will be proved at trial.

188.    Plaintiff Zenith Carex has engaged the undersigned counsels and is responsible for paying reasonable attorney's fees, See Subcontract Section P(c), Exhibit 1, attached.  Defendant is liable for payment of those fees pursuant to the Subcontract, as amended.

## COUNT XII – INJUNCTIVE RELIEF

189.    Plaintiff repeats and realleges Paragraphs 1 through 188 above, as if fully set forth herein.

190.    This is an action for injunctive relief, both temporary and permanent, against Defendant Chemonics.

191.    Plaintiff has suffered irreparable harm as a result of Defendant's conduct.

192.    Plaintiff will continue to suffer irreparable harm unless Defendant is enjoined upon pain of contempt to henceforth cease and desist from engaging in such malicious and defamatory conduct.

193.    Plaintiff will continue to suffer irreparable harm unless Defendant Chemonics is required to retract and disavow the knowingly false and fraudulent malicious statements against Plaintiff as set for herein.

194.    Plaintiff Zenith Carex has a clear legal right to relief hereunder and has no adequate remedy at law to salvage its reputation other than an injunction against Defendant which would require to immediately and henceforth cease and desist from engaging in any further defamatory acts or statements against Plaintiff and to publicly retract the defamatory statements in the same media and platforms the defamatory statements were published and publicly and unequivocally publicly apologize to Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Zenith Carex International Limited demands judgment against Defendant Chemonics International, Inc., as follows:

a)  For compensatory damages in an amount not less than TEN MILLION DOLLARS ($10,000,000.00 USD), or such other amount to be proved at trial;

b)  For punitive damages as to Counts I through X in an amount to be proven at trial, but not less than nine (9) times the sum of compensatory damages awarded hereby, or such maximum amount as provided by law, to punish and penalize Defendant Chemonics International, Inc. and deter Defendant Chemonics International, Inc. from repeating its unlawful conduct;

c) For an injunction requiring Defendant Chemonics International, Inc. to refrain, cease and desist from making defamatory statements against Plaintiff Zenith Carex International Limited of the nature and kind addressed in this action, or otherwise;

d) For an injunction requiring Defendant Chemonics International, Inc. to request the removal of all statements adjudicated defamatory in this case from any and all websites, any social media site, website, blog, or publication in which they may appear or be discovered in the future;

e) For an injunction requiring Defendant Chemonics International, Inc.to issue a public apology to Plaintiff Zenith Carex International Limited for any and all defamatory statements made against them; such apology to be previously approved by Plaintiff Zenith Carex International Limited or its counsel, which shall be published or posted in whatever forum such statements against Plaintiff Zenith Carex International Limited set forth herein have been published, along with any social media site, website, blog or publication in which they may appear or be discovered in the future, as well as a newspaper of national distribution in Nigeria, such as Punch, Premium Times, Rifnote, The Guardian, People's Gazette or ThisDay; and a paper of general circulation in the District of Columbia, such as the Washington Post or the Washington Times;

f) For an injunction enjoining Defendant Chemonics International, Inc. from any acts that may serve to hinder, delay, disrupt, impede, or interfere with fulfillment of its obligations under the Court's Order upon pain of contempt;

g) Permanently enjoining Defendant Chemonics International, Inc. as described above;

h) For costs of this action;

i) For attorneys' fees incurred by Plaintiff Zenith Carex International Limited in this action;

j) For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Zenith Carex International Limited demands a trial by jury of all issues so triable in this cause pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted this 27th day of February 2025.

*s/ W. Bruce Del Valle*
W. Bruce Del Valle

D.C. Bar No: 1520906
DEL VALLE LAW PLLC
300 New Jersey Avenue NW, Ste 300
Washington, DC  20001
Telephone: (386) 852-1969
*Email: brucedelvalle@gmail.com*


*s/Mark Olumuyiwa Sobo*
Mark Olumuyiwa Sobo
D.C. Bar No: 463902
MS LAW GROUP, LLC
9701 Apollo Drive, Suite 100 Largo,
MD 20774
240-751-5651
mark.sobo@muslawyers.com

**Attorneys for Plaintiff Zenith Carex
International Limited.**