**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| ZENITH CAREX INTERNATIONAL LIMITED, <br><br> *Plaintiff*, <br><br> v. <br><br> CHEMONICS INTERNATIONAL, INC., <br><br> *Defendant*. |

Civil Action No. 25 - 578 (LLA)

### MEMORANDUM OPINION AND ORDER

Plaintiff Zenith Carex International Limited ("Zenith") commenced this action against Chemonics International, Inc., d/b/a SAII Associates Ltd/Gte. ("Chemonics"), alleging a variety of claims arising out of Chemonics' alleged defamatory statements. ECF No. 1. Chemonics has filed a motion to dismiss Zenith's complaint. ECF No. 16. Chemonics has also filed counterclaims, ECF No. 22, to which Zenith provided an answer, ECF No. 23. For the foregoing reasons, the court will grant Chemonics' motion to dismiss.

### I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following factual allegations drawn from Zenith's complaint, ECF No. 1, are accepted as true for the purpose of evaluating the motion to dismiss, *Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Co.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).

### A.      The Subcontract

Chemonics, a corporation headquartered in the District of Columbia, is a global development firm that provided professional and logistics services to the former United States

Agency for International Development ("USAID").  ECF No. 1 ¶¶ 3, 8.[1]  Chemonics was tasked with managing the distribution of health commodities to Nigeria on behalf of USAID.  *Id.* ¶ 10. Chemonics was also responsible for the warehousing and distribution of commodities in Nigeria for the Global Fund to Fight AIDS ("the Global Fund"), an independent foundation that has historically received most of its funding from the United States government.  *Id.* ¶¶ 9-10. Chemonics conducted these activities in Nigeria through a subsidiary company, SAII Associates Ltd/Gte.  *Id.* ¶ 11.

On May 23, 2017, Chemonics, through its subsidiary, entered into a subcontract with Zenith "for the provision of long haul and last mile delivery services" in Nigeria (the "Subcontract") pursuant to Chemonics' contracts with USAID and the Global Fund.  *Id.* ¶¶ 14-15. The parties modified the Subcontract several times over the next few years, including a modification in 2019 that raised the contract price by an additional one billion naira, or approximately $2,783,000 USD.  *Id.* ¶¶ 16-18.

**B.    Chemonics' Disclosures to the U.S. Justice Department**

In January 2020, Chemonics disclosed to the U.S. Department of Justice ("DOJ") "allegations that Zenith had intentionally overbilled Chemonics for commodity distribution services and that there were allegations of possible collusion between one or more Chemonics

---

[1] USAID effectively ceased operations on February 23, 2025, and its functions were transferred to the Department of State.  *See* USAID, *Notification of Administrative Leave*, https://perma.cc/9ZZE-QDLC; Press Release, Marco Rubio, Sec'y of State, U.S. Dep't of State, *On Delivering an America First Foreign Assistance Program* (Mar. 28, 2025), https://perma.cc/H2QJ-4WVC.  The court will refer to the agency as USAID for purposes of this case.

employees and Zenith." ECF No. 1-9, at 2.[2] Unbeknownst to Zenith, the U.S. Attorney's Office for the Western District of Missouri then began investigating Chemonics for fraud and violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ECF No. 1 ¶ 31. Zenith alleges that "on a date or dates to be determined by subsequent discovery," Chemonics told DOJ that Zenith was responsible for the fraudulent overbilling. *Id.* ¶ 32.

### C.    Chemonics and Zenith's Private Arbitration and Settlement

In March 2020, Chemonics stopped paying Zenith's invoices. *Id.* ¶ 24. Zenith reported Chemonics' nonpayment to Nigeria's Federal Ministry of Health in August 2020, but the Ministry of Health did not respond. *Id.* Zenith then filed a petition with Nigeria's Economic and Financial Crimes Commission in February 2021, seeking to recover the remaining amount from the unpaid invoices. *Id.* Chemonics filed a counter-petition and later made a settlement offer, which Zenith accepted. *Id.*

Also in 2021, Chemonics initiated arbitration "to recover from a subcontractor (Zenith) that overcharged, by millions of dollars (USD), for the delivery of health commodities in Nigeria." ECF No. 1-6, at 2-3. Zenith alleges in its complaint that Chemonics did not "provide any substantiating proof" and instead proposed a settlement to Zenith, which Zenith "promptly accepted." ECF No. 1 ¶¶ 25-27. The parties accordingly filed a joint motion to close the arbitration and dismiss Chemonics' claims, which the arbitral tribunal granted. *Id.* ¶ 27; *see* ECF No. 1-7.

---

[2] When citing ECF Nos. 1-6 to 1-15, the court uses the page numbers generated by CM/ECF rather than any internal pagination.

Zenith and Chemonics executed a settlement agreement (the "Settlement Agreement") in March 2022. ECF No. 1 ¶ 28. As relevant here, the Settlement Agreement first defines the "Disputes" covered by the agreement to include the arbitral proceedings, Zenith's petitions and Chemonics' cross-petition to the Economic and Financial Crimes Commission, Zenith's petition to the Federal Ministry of Health, "and any other controversies arising under or relating to the Subcontract." ECF No. 1-8, at 4. Per the agreement, each party, "without admission of liability for any alleged breach whatsoever, or any wrongful, unlawful, unjust or any like conduct, undertakes to release the other Party and its Related Parties of all obligations and liabilities arising from any of the Disputes and the Subcontract." *Id.* at 5. The Release section provides as follows:

> 6. **Release**
>
> This Deed is in full and final settlement of, and each Party releases and forever discharges, all and any actions, claims, rights, demands and set-offs, whether in this jurisdiction or any other, whether or not presently known to the Parties or to the law, and whether in law or equity, that it, its Related Parties or any of them ever had, may have or hereafter can, shall or may have against any other Party of any of its Related Parties arising out of or connected with:
>
>> (a) the Disputes;
>>
>> (b) the underlying facts relating to the Disputes;
>>
>> (c) any agreement between or act by the Parties or their Related Parties or any of them; and
>>
>> (d) any other matter arising out of or connected with the relationship between the Parties.
>
> (Collectively, the **"Released Claims"**).

*Id.* at 6.

The parties also agreed "not to sue, commence, voluntarily aid in any way, prosecute, or cause to be commenced or prosecuted against the other Party or its Related Parties any action, suit

or other proceedings concerning the Released Claims, in this jurisdiction or any other," with a limited exception for claims alleging breach of the Settlement Agreement itself. *Id.*

### D.    Chemonics and DOJ's Settlement

In December 2024, DOJ issued a press release announcing a settlement with Chemonics. ECF No. 1-10, at 2. Under the settlement, Chemonics agreed to pay approximately $3.1 million to the United States to "resolve[] allegations that Chemonics acted recklessly in failing to detect fraudulent charges by its subcontractor, Zenith Carex (Zenith), for certain delivery services in Nigeria[] and passed the charges on to USAID." *Id.* The press release stated that "[b]etween June 2017 and March 2020, Zenith fraudulently charged Chemonics for its long-haul delivery services based on truck tonnage as opposed to the weight per kilogram of the commodity transported, as the subcontract between Chemonics and Zenith required" and "charged Chemonics more for last-mile delivery services than the subcontract allowed." *Id*. at 2-3.

In the settlement agreement between DOJ and Chemonics, DOJ laid out several additional factual details. ECF No. 1-9, at 2. DOJ stated that "Zenith fraudulently charged Chemonics for its transportation services based on truck tonnage" and by overcharging for last-mile delivery services, that "Chemonics submitted claims for payment to USAID that were false because they relied upon Zenith's fraudulent charges," and that "Chemonics' failure to detect Zenith's fraudulent overcharging was a result of Chemonics' systematic process and personnel failures." *Id*. at 3. Chemonics "denied" those factual allegations. *Id*. at 5. DOJ also recognized that "Chemonics self-disclosed the conduct and cooperated with the United States' multi-year investigation," and that it "took remedial action to address Zenith's fraudulent overbilling." *Id*. at 4. The settlement agreement noted that it represented "neither an admission of liability by Chemonics nor a concession by the United States that its claims are not well-founded." *Id*. at 5.

Following DOJ's press release, news outlets including Devex, Peoples Gazette, and Rifnote Media published articles describing the settlement. ECF No. 1 ¶¶ 46-52; *see* ECF Nos. 1-12, 1-13, 1-15. Peoples Gazette and Rifnote Media stated that DOJ had fined Chemonics "over fraud by" Zenith. ECF No. 1-13, at 2; ECF No. 1-15, at 2. Rifnote Media further stated that Chemonics agreed to pay the fine "over the fraudulent activities of its Nigerian subcontractor Zenith for inflating its bills, massively overcharging U.S. Agency for International Development (USAID) for distributing sensitive HIV/AIDS treatment packages." ECF No. 1-15, at 3. And Devex published a statement directly from a Chemonics spokesperson saying that the settlement "brings finality to this matter and we continue to deny liability as the subcontractor [Zenith] defrauded Chemonics and the U.S. government despite the controls and oversight both have in place." ECF No. 1 ¶ 46; *see* ECF No. 1-12, at 3.

### E.     The Instant Suit

In February 2025, Zenith filed this suit, alleging defamation, defamation per se, injurious falsehood, tortious interference, and breach of contract based on Chemonics' statements to DOJ, Devex, Rifnote Media, and Peoples Gazette. ECF No. 1 ¶¶ 58-188. Chemonics filed a motion to dismiss, ECF No. 16, and subsequent counterclaims for breach of the settlement agreement, ECF No. 22. The motion to dismiss is fully briefed, *see* ECF Nos. 16, 19, 21, and Zenith has filed an answer to Chemonics' counterclaims, ECF No. 23.

### II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), the court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

6

*Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In evaluating a motion under Rule 12(b)(6), a court accepts all well-pleaded factual allegations in the complaint as true.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009).  Although the plausibility standard does not require "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Nor will "'naked assertion[s]' devoid of 'further factual enhancement'" suffice.  *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

In determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice."  *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alteration in original) (quoting *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017)).

## III.    DISCUSSION

Zenith raises claims of defamation and defamation per se arising out of Chemonics' statements (Counts I to VIII), ECF No. 1 ¶¶ 58-159, as well as claims of injurious falsehood (Count IX), tortious interference (Count X), and breach of the subcontract (Count XI), *id.* ¶¶ 160-188.[3]  Chemonics argues that all of Zenith's claims are barred by the release of claims in

---

[3] Zenith also alleged a twelfth count requesting injunctive relief but later withdrew that count on the basis that "a request for injunctive relief is not a stand-alone claim in the District of Columbia." ECF No. 19, at 42.

the parties' 2022 Settlement Agreement.  ECF No. 16, at 10-14.  It also argues for dismissal based on the judicial proceedings privilege, *id.* at 14-16, the fair report privilege, *id.* at 16-19, the applicable statutes of limitations, *id.* at 19-23, and Zenith's failure to state a claim, *id.* at 23-41. Because the court concludes that Zenith's claims are barred by the Settlement Agreement, it need not reach Chemonics' other arguments for dismissal.

Chemonics chiefly argues that the case should be dismissed because the parties' Settlement Agreement released all claims between the parties.  *Id.* at 10-11 & n.2.[4]  "When assessing whether a plaintiff has waived [its] right to bring a particular claim by signing a release, the normal rules of contract interpretation apply."  *Keister v. AARP Benefits Comm.*, 410 F. Supp. 3d 244, 250 (D.D.C. 2019), *aff'd*, 839 F. App'x 559 (D.C. Cir. 2021).  Because this court is exercising diversity jurisdiction, it will construe the contract in accordance with District of Columbia contract-law principles.[5]  "Under District of Columbia law, if the language of a release is not ambiguous on its

---

[4] Chemonics frames this as an argument for dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1), ECF No. 16, at 1, but it curiously asks for dismissal "with prejudice," *id.*, which is not available when a court lacks subject-matter jurisdiction, *see N. Am. Butterfly Ass'n*, 977 F.3d at 1253 (noting that "a dismissal for want of subject-matter jurisdiction can only be without prejudice").  As Chemonics acknowledges, "there is 'some disagreement among courts in this Circuit about whether [requests to dismiss due to a settlement agreement] are appropriately resolved under Rule 12(b)(1) or 12(b)(6),'" which might account for the company's confusion. ECF No. 16, at 10 n.2 (quoting *Giri v. Nat'l Bd. of Med. Exam'rs*, No. 24-CV-410, 2025 WL 304786, at *5 (D.D.C. Jan. 27, 2025), *appeal dismissed*, No. 25-7021, 2025 WL 1600484 (D.C. Cir. June 5, 2025)).  That disagreement is likely owing to differences in the timing of the relevant settlement agreement.  A settlement during the pendency of litigation can moot a case and deprive the court of subject-matter jurisdiction, *see Lake Coal Co. v. Roberts & Schaefer Co.*, 474 U.S. 120, 120 (1985) (per curiam), whereas the scope and validity of a pre-litigation release of claims is a merits question appropriately resolved on a motion under Rule 12(b)(6), *see Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 435 & n.9 (2017).  The court accordingly considers Chemonics' settlement-agreement arguments under Rule 12(b)(6).

[5] The Settlement Agreement contains a provision stating that the agreement "and any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with it or its

(*continued on next page*)

8

face, the Court 'must rely solely upon its language as providing the best objective manifestation of the parties' intent.'" *Fed. Deposit Ins. Corp. v. Parvizian, Inc.*, No. 94-CV-132, 1996 WL 640839, at *3 (D.D.C. Jan. 31, 1996) (quoting *Bolling Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 475 A.2d 382, 385 (D.C. 1984)); *see Dyer v. Bilaal*, 983 A.2d 349, 361 (D.C. 2009) (explaining that "absent ambiguity, we enforce written contracts according to their terms" and without extrinsic evidence).

Chemonics argues that the plain language of the Settlement Agreement bars all of Zenith's claims.  The court agrees.  A core factual premise of Zenith's eleven claims—expressly incorporated into each count—is that Chemonics made defamatory statements to various entities that Zenith was responsible for fraud and overbilling under the Subcontract.  *See* ECF No. 1 ¶¶ 32-46 (alleging that Chemonics knowingly made false statements about Zenith's purported fraud under the Subcontract); *id.* ¶¶ 58, 71, 85, 97, 110, 122, 135, 147 ("repeat[ing] and realleg[ing] Paragraphs 1 through 57" in Counts I to VIII); *id.* ¶ 160 ("repeat[ing] and realleg[ing] Paragraphs 1 through 159" in Count IX); *id.* ¶ 167 ("repeat[ing] and realleg[ing] Paragraphs 1 through 166" in Count X); *id.* ¶ 179 ("repeat[ing] and realleg[ing] Paragraphs 1 through 177" in Count XI).

In the Settlement Agreement, Zenith released "all and any actions [or] claims," "whether or not . . . known" to Zenith at the time of the agreement, that Zenith "ever had, may have or

---

subject matter or formation shall be governed by and construed in accordance with the laws of Federal Republic of Nigeria."  ECF No. 1-8, at 8.  But Chemonics proceeds on the assumption that District of Columbia contract law governs the dispute, *see* ECF No. 16, at 11-12, and Zenith does not argue otherwise, *see* ECF No. 19, at 26-27.  And "[u]nlike jurisdictional issues, courts need not address choice of law questions *sua sponte*." *In re Korean Air Lines Disaster of Sep. 1, 1983*, 932 F.2d 1475, 1495 (D.C. Cir. 1991).  The court will accordingly construe the contract in accordance with District of Columbia contract law.

hereafter can, shall or may have . . . arising out of or connected with: (a) the Disputes; (b) the underlying facts relating to the Disputes; (c) any agreement between or act by the Parties or their Related Parties or any of them; and (d) any other matter arising out of or connected with the relationship between the Parties." ECF No. 1-8, at 6. The "Disputes," in turn, include the arbitral proceedings, Zenith's petitions and Chemonics' cross-petition to the Nigerian Economic and Financial Crimes Commission, and Zenith's petition to the Federal Ministry of Health, along with "any other controversies arising under or relating to the Subcontract." *Id*. at 4.

Chemonics' statements about any fraud in Zenith's performance of the Subcontract clearly arise out of a "controvers[y] . . . relating to the Subcontract"—that is, DOJ's investigation into Chemonics for committing fraud and violating the False Claims Act by recklessly failing to prevent Zenith's alleged fraud under the Subcontract. Zenith's claims are accordingly barred by subsection (a) of the release because they "aris[e] out of" or are "connected with" a controversy relating to the Subcontract. *See id.* at 6.

Zenith's claims are also barred by subsection (b) of the release because they arise from "the underlying facts relating to the Disputes." *Id.* As Zenith concedes, the underlying arbitral proceedings giving rise to the Settlement Agreement arose from Chemonics' allegations of "fraud and inflated invoicing" against Zenith under the Subcontract. ECF No. 1 ¶ 25; *see* ECF No. 1-6, at 2-3 (explaining that Chemonics initiated the arbitral proceedings "to recover from a subcontractor (Zenith) that overcharged, by millions of dollars," under the Subcontract). The "underlying facts relating to the Disputes" thus center on Chemonics' allegations that Zenith fraudulently overbilled for its services under the Subcontract. Here, each of the first ten counts of the complaint alleges that Chemonics harmed Zenith by making statements about Zenith's alleged fraud and overbilling under the Subcontract. *See* ECF No. 1 ¶¶ 58-159 (alleging eight counts of

defamation based on Chemonics' statements that Zenith fraudulently overbilled for its services under the Subcontract); *id.* ¶¶ 160-166 (alleging injurious falsehood based on the same statements); *id.* ¶¶ 167-178 (alleging that Chemonics committed tortious interference "by taking the actions described herein"). Counts I to X are thus all "claims" that one of the parties—Zenith— "may have or hereafter can, shall or may have" against the other party—Chemonics—"arising out of or connected with . . . the underlying facts relating to the Disputes," and they are thus covered by the plain text of the Settlement Agreement. ECF No. 1-8, at 6. Count XI even more obviously arises out of the underlying disputes, for there Zenith alleges breach of the Subcontract itself. ECF No. 1 ¶¶ 179-188.

Lest there be any doubt, subsection (c) of the release covers "all and any claims . . . arising out of or connected with . . . any agreement between or act by the Parties." ECF No. 1-8, at 6. This section is also sufficient to cover all eleven counts, each of which alleges "acts" by Chemonics *and* "arises out of" an agreement between the parties, i.e., the underlying Subcontract. And in subsection (d), Zenith agreed to release "all and any claims . . . arising out of or connected with . . . *any other matter arising out of or connected with the relationship between the Parties*." *Id.* (emphasis added). That is, Zenith released "all and any" claims arising out of *any* matter arising out of "the relationship between the Parties." The language could not be clearer: it unambiguously releases Chemonics from essentially "any claims" brought by Zenith, and that certainly includes these claims, which stem from the alleged fraud in connection with the parties' underlying Subcontract.

Zenith does not contend with the broad language of the release, but instead raises a variety of counterarguments. None is availing. First, Zenith suggests that "the earlier dispute leading to the [Settlement Agreement] and release involved breaches of contract asserted by both parties and

11

were unrelated to Defendant's later tortious behavior." ECF No. 19, at 22. This argument misunderstands the Settlement Agreement, in which the parties agreed to release a much broader swath of claims than those at issue in the arbitration proceeding. *See* ECF No. 1-8, at 6 (releasing "all and any actions, claims, rights, demands and set-offs"). Indeed, the arbitral proceedings are just one component of the Settlement Agreement's broad definition of covered "Disputes." *Id.* at 4 (including "any other controversies . . . relating to the Subcontract"). A defamation suit based on one party's statements about another party's fraud in performing a contract surely is a controversy "relating to the []contract" and is thus barred by the release. But even if that were not the case, as the court has already explained, the release extends more broadly than to just the broadly worded "Disputes"—it covers "all and any claims" connected with "the underlying *facts* relating to the Disputes" or "arising out of or connected with the *relationship between the Parties*." *Id*. at 6 (emphases added). Relatedly, to the extent Zenith is arguing that its claims fall outside the release because they sound in tort rather than contract, that argument runs directly counter to the "all and any claims" language in the release. *See GLM P'ship v. Hartford Cas. Ins. Co.*, 753 A.2d 995, 999 (D.C. 2000) ("The mere fact that the release did not use the terms 'negligence' or 'tort' did not render invalid its application as a general release.").

Zenith next argues that because the facts giving rise to the defamation and related claims "had not yet occurred, the parties cannot be said to have contemplated or intended the release to bar such future claims." ECF No. 19, at 26. But the Settlement Agreement expressly includes a waiver of claims "whether or not presently known to the Parties or to the law" that Zenith "ever had, may have or hereafter can, shall or may have." ECF No. 1-8, at 6. Given the broad language of the Settlement Agreement, Zenith's reliance on cases in which the plaintiff had only agreed to waive "matters that he alleged or could have alleged" in his mediation proceeding, *Herbert v.*

12

*Architect of Capitol*, 839 F. Supp. 2d 284, 298 (D.D.C. 2012), or in which the plaintiff waived only those claims "existing on or before the date of the agreement," *Pilon v. U.S. Dep't of Just.*, 796 F. Supp. 7, 11 (D.D.C. 1992); *see* ECF No. 19, at 26, falls short. Although a party may elect not to release future claims when negotiating a settlement, the unambiguous terms of *this* release cover claims that Zenith "hereafter can, shall or may have." ECF No. 1-8, at 6.[6] Indeed, the court in *Pilon* noted that the plaintiff had rejected a previous draft contract covering claims he "may have or hereafter acquire" against the defendant—much like the language to which Zenith actually agreed. *Id.* at 11.

Zenith devotes a paragraph to arguing that collateral estoppel cannot preclude its suit, ECF No. 19, at 26, but there is no issue of collateral estoppel before the court. Zenith also suggests that the underlying claims Chemonics raised in arbitration were "baseless" and cannot serve as a "license to defame and otherwise harm Zenith." *Id.* at 22. But Zenith cannot relitigate the underlying merits of the claims it agreed to settle—the primary purpose of the Settlement Agreement was to allow the parties to release current and future claims "without admission of liability for any alleged breach whatsoever." ECF No. 1-8, at 5.

Finally, Zenith argues that even if the release covered its claims, "the release is unenforceable due to a lack of consideration." ECF No. 19, at 27. Zenith suggests that "there is no additional consideration alleged or shown other than payment to Plaintiff for its breach of contract damages, with none for the additional release of future torts." *Id*. That argument again evinces a fundamental misunderstanding of the Settlement Agreement, which is a bilateral

---

[6] What is more, Chemonics' statements to DOJ were made prior to March 2020, *see* ECF No. 1 ¶ 34, so it can hardly be said that claims based on those statements constitute "future" claims with respect to the parties' 2022 Settlement Agreement, *id.* ¶¶ 27-29.

agreement between the parties that includes, among other conditions, an agreement to release all claims as described in the release section.  It is well established that "the relinquishment or waiver of a legal or contract right or privilege is sufficient consideration for a promise."  *GLM P'ship*, 753 A.2d at 1000 (internal quotation marks omitted); *see Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1, 11 (D.D.C. 2021) ("A promise is a sufficient consideration for a return promise." (quoting *3511 13th St. Tenants' Ass'n v. 3511 13th St., N.W. Residences, LLC*, 922 A.2d 439, 443 (D.C. 2007))). Here, Chemonics made several promises: it promised to pay a lump sum of money to Zenith, ECF No. 1-8, at 5; it promised to withdraw its petition before the Nigerian Economic and Financial Crimes Commission "and forever discharge Zenith of any wrongdoing," *id.* at 6; it promised not to bring any action against Zenith concerning the released claims, *id.*; and it promised to be bound by Nigerian law in any dispute arising out of the Settlement Agreement, *id.* at 8, just to name a few.  The one case Zenith cites merely reaffirms an uncontroversial principle of contract law: that modification of a unilateral contract requires new consideration.  *City Stores Co. v. Ammerman*, 266 F. Supp. 766, 772 (D.D.C. 1967); *see* ECF No. 19, at 26-27.  There is no modification at issue here, and so the parties' bargained-for exchange, including the release of all claims, is enforceable.

## IV.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Chemonics' motion to dismiss, ECF No. 16, is **GRANTED**, and Zenith's claims are **DISMISSED** with prejudice.  It is further

**ORDERED** that the parties shall meet and confer and file a joint status report proposing next steps

with respect to Chemonics' counterclaims, ECF No. 22, on or before April 1, 2026.

_____

LOREN L. ALIKHAN
United States District Judge

Date:   March 18, 2026